428 F.2d 235
 Robert JAMES, Appellant,
v.
Roger B. COPINGER, Warden, Maryland Penitentiary, Appellee.
Preston HANCOCK, Appellant,
v.
WARDEN, MARYLAND PENITENTIARY, Appellee.
Edward L. TIBBS, Appellant,
v.
C. C. PEYTON, Superintendent of the Virginia State
Penitentiary, Appellee.
Matthew Mack CALLAHAN, Appellant,
v.
C. C. PEYTON, Superintendent of the Virginia State
Penitentiary, Appellee.
 Nos. 12474, 12570, 12572, 13024.
 United States Court of Appeals, Fourth Circuit.
 Argued Feb. 5, 1970.
Decided June 16, 1970.
 
 Irvin B. Nathan, Washington, D.C., (Court-assigned counsel), for appellants.
 Alfred J. O'Ferrall, III, Asst. Atty. Gen., of Maryland (Francis B. Burch, Atty. Gen., of Maryland and Edward F. Borgerding, Asst. Atty. Gen., of Maryland, on the brief), for appellee Mark B. Copinger.
 Reno S. Harp, III, Asst. Atty. Gen., of Virginia (Robert Y. Button, Atty. Gen., of Virginia, on brief), for appellee C. C. Peyton.
 Before HAYNSWORTH, Chief Judge, and BRYAN and CRAVEN, Circuit Judges.
 CRAVEN, Circuit Judge:
 
 
 1
 These four cases were consolidated for appeal because they present a common question of law. Each petitioner contends, inter alia, that he was denied due process under the fourteenth amendment because his statutory right to appeal was effectively denied. It is each petitioner's contention that he was unfairly deterred from prosecuting an appeal by fear of receiving increased punishment if successful in obtaining a new trial. We think as a matter of comity this question should first be presented to the respective state courts and remand these cases to the district courts with instructions.
 
 I.
 A. Robert James
 
 2
 Robert James was convicted of first degree murder and sentenced to life imprisonment by the Criminal Court of Baltimore on March 31, 1939. He did not appeal from his conviction and sentence. On May 7, 1965, he applied for relief under the Maryland Post Conviction Procedure Act.
 
 
 3
 In his state petition James raised eight points of error. Among these were allegations that his motion for a new trial had been denied because he was unable to pay an attorney to represent him on the motion and that his request for an appeal was denied because he was indigent and unable to afford a transcript or counsel. After a hearing the state judge rejected all of James' contentions and denied his petition. The state court made the following comment in its opinion:
 
 
 4
 The court is satisfied that he was not deprived of his right to have his Motion for New Trial heard because of indigency; it is apparent that he was content to have it withdrawn in consideration of the fact that he was to receive life imprisonment rather than capital punishment.
 
 
 5
 Memorandum Opinion of O'Donnell, J. at 6 (March 10, 1966). The Maryland Court of Special Appeals affirmed the trial court's denial of relief.
 
 
 6
 The statement quoted above was predicated, at least in part, on the testimony of James' court-appointed attorney. That testimony, in pertinent part, was:
 
 
 7
 THE COURT: Mr. James, the Petitioner here, says that this motion for a new trial which you filed on his behalf was not prosecuted, was withdrawn without his knowledge and without his consent. Do you have any recollection in connection with that, Mr. Henry?
 
 
 8
 THE WITNESS: I guess I do, your honor. I talked with the defendant. This is customary after a trial to talk with the defendant. I talked with Mr. James about his case and told him that I thought he made a good witness. I thought he had had a fair trial and I said you know we have a right under the law to file a motion for a new trial, but, now, if that motion is granted to get a new trial and you're found guilty * * * your punishment may be greater, and I said, how do you feel about it. As I recall, he said that he didn't want to prosecute the motion.
 
 
 9
 Q. In other words, was this after he had realized he would get life imprisonment?
 
 
 10
 A. That's right. I told him that.
 
 
 11
 Record, State Post Conv. Hear. (James), vol. 2, at 4-5 (February 14, 1966).
 
 
 12
 On May 16, 1967, James petitioned the United States District Court for a writ of habeas corpus, alleging that he had been denied the assistance of appellate counsel because of indigency. After argument by James' privately retained counsel, the district court, in an oral opinion, denied James' petition. In this opinion the district court stated, inter alia:
 
 
 13
 Now, the allegation that Mr. Henry withdrew the motion for a new trial without the consent of the petitioner and the petitioner did not waive this right is fully dealt with by Judge O'Donnell and is rather clearly negatived by Mr. Henry's testimony in the postconviction hearing. The Court sees no reason to doubt what Mr. Henry said. Everything seems to tie together to make it perfectly clear that the motion for a new trial was not pressed and was in fact waived by the defendant and that the defendant, asI have said before, was satisfied that he escaped the death chamber.
 
 
 14
 Record, Proceedings in United States District Court for the District of Maryland (James) at 3 (April 5, 1968). James has appealed from this denial of his petition. On appeal he asserts for the first time that he was denied his state statutory right to appeal because of fear of receiving the death penalty on retrial.
 
 B. Preston Hancock
 
 15
 On October 4, 1961, two Baltimore City Judges, sitting without a jury, convicted Preston Hancock of rape, assault with intent to murder, and burglary and sentenced him to death. The Maryland Court of Appeals reversed his conviction because the court reporter in attendance at his trial died, and there was, as a result, no transcript to review. At his second trial a single judge sitting without a jury again convicted Hancock of all three charges. This time he was sentenced to life imprisonment for rape and concurrent ten year sentences for the assault and burglary offenses. He noted an appeal, but withdrew it within a month after he was sentenced.
 
 
 16
 On February 15, 1965, Hancock filed a petition under the Maryland Post Conviction Procedure Act, alleging seven grounds for relief. Among these grounds was the contention that his attorney had induced him to abandon his appeal by promising to get him into a hospital. With reference to this point Hancock's attorney testified, in part, as follows:
 
 
 17
 Q. Mr. Hancock filed an appeal to the Court of Appeals in proper person, and then he withdrew it, and he states, or he stated on the stand that the reason he withdrew it was because you induced him to withdraw it by promising him that he would get into a hospital, or you would attempt to get him into a hospital. Is this true?
 
 
 18
 A. I don't have any notes. I remember when we tried the case, that I told Preston that I felt that he was very lucky as a result of the facts of this case that he was not sentenced to death, as he had been originally; that with a life sentence he now had an opportunity at some future date to be released from the hospital, that I felt-- from the Maryland Penitentiary; that I felt that he was in need of psychiatric treatment and that he should-- and that I would try to help him get psychiatric treatment. I asked him why he was appealing his case, and-- well, this then becomes almost a confidential communication-- nevertheless, after talking to Preston, I think he agreed that he should abandon the appeal because I did explain to him that if he was successful, which I doubt anyway, that he would be faced with another trial, and could possibly be sentenced to death.
 
 
 19
 Q. Well, Mr. Weisgal, as a matter of fact, didn't your discussions concerning his abandoning his appeal border on the fact that he could get, in fact, a death sentence if he was retried again?
 
 
 20
 A. I brought that up to him. I explained that to him.
 
 
 21
 Q. And whose decision was it to abandon his appeal?
 
 
 22
 A. It was his decision.
 
 
 23
 Record, State Post Conv. Hear. (Hancock) at 55-57 (September 30, 1965). The state court denied Hancock's petition, and the Maryland Court of Special Appeals denied him leave to appeal.
 
 
 24
 Thereafter, on November 14, 1967, Hancock sought a writ of habeas corpus in the United States District Court. In his petition he raised ten grounds for relief, including the ground that he was induced to abandon his appeal by his attorney's promise to have him admitted to a hospital. The district court, after concluding that the state court hearing satisfied the requirements of Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), and 28 U.S.C. Section 2254(d) (Supp. IV. 1965-68), denied the petition. Regarding Hancock's abandonment of his state appeal the district court stated:
 
 
 25
 After the conviction, Mr. Weisgal explained to petitioner that if an appeal was taken, and if the appeal was successful, petitioner at the third trial could receive the death sentence if convicted. According to Mr. Weisgal, petitioner thereupon decided to abandon his appeal and in fact wrote a letter so stating. * * * Having been sentenced to death following his first trial and having received a life sentence after his second trial, petitioner was well advised not to prosecute a further appeal, particularly in view of the convincing evidence produced against him by the State. At a third trial, a conviction by a jury or by still another judge might have again resulted in the imposition of the death sentence. The record clearly shows that after filing an appeal after his second conviction, he knowingly abandoned the appeal for good and sufficient reasons.
 
 
 26
 Memorandum & Order of Harvey, J. at 7-8 (May 9, 1968). Hancock now appeals from the unfavorable order of the district court. On appeal he complains for the first time that he was unconstitutionally coerced into forgoing his statutory right to appeal by fear of receiving greater punishment at a subsequent trial.
 
 C. Edward L. Tibbs
 
 27
 On December 12, 1960, the Corporation Court of Charlottesville, Virginia, imposed a 15-year sentence on Edward Tibbs for robbery by force and violence. Tibbs is presently serving that sentence. On December 16, 1960, the Circuit Court of Albemarle County sentenced him to ten years for armed robbery, to be served after his 15-year sentence expires. The maximum possible sentence for both armed robbery and robbery by force and violence in Virginia is death.
 
 
 28
 In January 1966 Tibbs challenged the ten-year sentence in the United States District Court for the Eastern District of Virginia on the ground, inter alia, that he was denied the right of appeal. The district judge agreed and ordered that the state either allow Tibbs to apply for a writ of error to the Supreme Court of Appeals of Virginia, retry him, or release him. The Supreme Court of Appeals subsequently granted him leave to appeal, but, after conferring with appointed counsel, Tibbs stated by letter dated October 19, 1966, that he wished to withdraw his appeal.
 
 
 29
 Subsequently, on January 18, 1968, he filed a second federal petition, raising the same claims asserted in his first petition and the additional claim that he had withdrawn his state appeal due to 'threats of the lawyer and Prosecutor.' In an order granting Tibbs' request to withdraw his appeal, the Circuit Court of Albemarle County had stated:
 
 
 30
 5. On October 10, 1966, the said Forbes R. Reback (Tibbs' attorney appointed on appeal) journeyed to the City of Richmond, Virginia and there met in extended consultation with the said Edward Lee Tibbs and then and there advised him of all of his rights and discussed with him several possibilities and probabilities which he could expect in the event that a writ of error was allowed. A copy of the transcript of the trial held December 16, 1960, was left with the said Edward Lee Tibbs for his examination.
 
 
 31
 6. On October 20, 1966, the said Forbes R. Reback received a letter from Edward Lee Tibbs dated October 19, 1966, a copy of which has been filed with the papers in this case in which the said Edward Lee Tibbs clearly states his desire after mature consideration, to proceed no further with this appeal and that the matter be henceforth removed from the docket.
 
 
 32
 Order of Waddell, J. at 2 (November 28, 1966). The United States District Court dismissed Tibbs' petition on June 3, 1968, 287 F.Supp. 858, primarily on the ground that he had voluntarily withdrawn his state appeal.
 
 
 33
 Tibbs appealed from the order of dismissal. On appeal, he clearly articulates, for the first time, his contention that he was denied the right to appeal because he feared increased punishment at a new trial.
 
 D. Matthew Mack Callahan
 
 34
 A Virginia jury convicted Matthew Mack Callahan of rape on May 23, 1957. His sentence was life imprisonment. Although the court granted a motion to suspend execution of sentence pending perfection of an appeal, Callahan perfected no appeal,[1] and he has been serving his sentence since July 31, 1957.
 
 
 35
 On December 23, 1965, Callahan filed a state petition for a writ of habeas corpus, alleging, inter alia, that he was denied effective assistance of counsel after trial by his lawyer's failure to perfect an appeal. See Petition for Writ of Habeas Corpus by Matthew Mack Callahan; Record, State Post Conv. Hear. (Callahan), vol. 1, at 21-33 (September 20, 1966). In its order denying Callahan's petition, the state court said:
 
 
 36
 Petitioner's two attorneys fully advised petitioner of his right to appeal and were ready, willing and able to perfect the appeal if the petitioner so requested. But petitioner advised his two attorneys that he did not desire to appeal.
 
 
 37
 Order of Huntley, J. at 1 (January 5, 1967). At the state hearing one of Callahan's attorneys had testified:
 
 
 38
 After I gave Mr. Callahan my opinion as to what we thought we could do and we-- I told him he had a right of appeal, he asked me what could occur in a new trial and I told him that the jury could acquit him, give him life, or years in the penitentiary, or the electric chair. During this trial, I believe the Commonwealth's Attorney had asked for the death penalty. And he told me that if that were the case and there was a chance that he might get the electric chair, that he would forget it, accept life.
 
 
 39
 Record, State Post Conv. Hear. (Callahan), vol. 1, at 41 (September 20, 1966). Callahan wrote a letter to his other trial attorney on June 4, 1957. This letter, introduced at the state hearing, corroborates the above testimony:
 
 Dear Sirs:
 
 40
 I am thanking you very much for defending me in Court.
 
 
 41
 * * * I have decided to let the life sentence stand and forget the appeal.
 
 
 42
 I have realized I couldn't have a better defense lawyer anywhere then you.
 
 
 43
 And I appreciate it very much and sure thanks you.
 
 
 44
 I am still praying to God to help me.
 
 Yours Truly M. M. Callahan
 
 45
 Petitioner's Exhibit A (Callahan); Record, State Post Conv.Hear. (Callahan), vol. 1, at 51 (September 20, 1966). On October 10, 1967, the Supreme Court of Appeals of Virginia upheld the lower state court's denial of a writ.
 
 
 46
 On December 18, 1967, Callahan filed a petition for a writ of habeas corpus in federal district court, alleging, inter alia, that he had been denied effective representation of counsel. Callahan did not allege that he had been denied his right to appeal for fear of receiving increased punishment upon retrial. The district court, on November 14, 1968, dismissed the petition without a hearing. In its order the court stated:
 
 
 47
 On June 4, 1957, the petitioner wrote a letter to one of his attorneys saying that he did not want to appeal the conviction * * *. This choice was dictated because the petitioner realized that on a retrial he could receive the death penalty * * *.
 
 
 48
 Memorandum and Order of MacKenzie, J. at 2 (November 14, 1968). Callahan appeals from this order, alleging in this court for the first time that he was denied his right to appeal by fear of receiving increased punishment upon retrial.
 
 II.
 
 49
 It is clear that the petitioners have failed to exhaust their state remedies and, indeed, failed to present to the federal district courts the constitutional claim now urged upon us. Although James, Hancock and Callahan alleged in state court that they had been denied the right to appeal, they never advanced the theory now asserted that the right of appeal was effectively denied due to fear of harsher punishment on retrial. James complained that his appeal was foreclosed by indigency, Hancock that his attorney had induced him to abandon his appeal by false promises, and Callahan simply that he was denied the effective assistance of counsel by his attorney's failure to perfect an appeal. For reasons subsequently explained under III, Tibbs sought no relief at all in state court. Therefore, all of the petitioners other than Tibbs presented issues to the state courts that differed materially from the issue they now urge us to decide. It is well settled that when a state prisoner files a claim in federal court that differs materially from his claim in state court, he has not adequately exhausted his state remedies. United States ex rel. Figueroa v. McMann, 411 F.2d 915 (2d Cir. 1969); Schiers v. California, 333 F.2d 173 (9th Cir. 1964); Rose v. Dickson, 327 F.2d 27 (9th Cir. 1964); Daugharty v. Gladden, 257 F.2d 750 (9th Cir. 1958); United States ex rel. Langer v. Ragen, 237 F.2d 827 (7th Cir. 1956); Cranor v. Cooper, 203 F.2d 833 (9th Cir. 1953); cf. Garrison v. Patterson, 405 F.2d 696 (10th Cir. 1969); Thompson v. Peyton, 406 F.2d 473 (4th Cir. 1968); Rowe v. Peyton, 383 F.2d 709 (4th Cir. 1967), affirmed, 391 U.S. 54, 88 S.Ct. 1549, 20 L.Ed.2d 420 (1968); Flemings v. Wilson, 365 F.2d 267 (9th Cir. 1966); Kirby v. Warden, Md.Pen., 296 F.2d 151 (4th Cir. 1961), cert. denied, 368 U.S. 1002, 82 S.Ct. 635, 7 L.Ed.2d 541 (1962); United States ex rel. Sproch v. Ragen, 246 F.2d 264 (7th Cir. 1957).
 
 
 50
 With respect to James, Hancock, and Callahan, the state and federal courts seem to have recognized that they abandoned their appeals because they feared increased punishment on reconviction. As to Tibbs, who has not sought relief in the state courts, there is some intimation in the Albemarle County Circuit Court's order, dismissing his state appeal as requested, that he, also, may have feared a more severe sentence upon retrial.
 
 
 51
 North Carolina v. Pearce, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969), had not been decided at the time of these respective state and federal court decisions. In Pearce the Supreme Court held that while the Constitution did not impose an absolute bar to a more severe sentence upon reconviction, reasons for the harsher sentence based upon 'objective information concerning identifiable conduct on the part of the defendant occurring after the time of the original sentencing proceeding' must 'affirmatively appear' in the record. 395 U.S. at 726, 89 S.Ct. at 2081.
 
 
 52
 Before Pearce an important and often controlling factor in deciding whether to appeal was the risk of receiving a harsher sentence, if convicted again at a second trial. As the testimony of petitioners' attorneys and the comments of the state and federal judges participating in these cases demonstrate, it was assumed before Pearce that state prisoners had no constitutional right to pursue their appeals unfettered by this sort of inherent coercion. Appellants argue that Pearce requires a re-examination of that assumption.[1]
 
 
 53
 We think it inappropriate for us to now decide the question. These petitioners are state prisoners. They ought first to present a novel constitutional contention, said to be supported by Pearce, to the respective state courts. The state courts are better positioned to determine the basic fact question of why no appeal was taken and the impact upon state administration of justice of an extension of Pearce, as well as its possible retroactive application. When a petitioner asserts a claim in federal court and that claim is affected by a Supreme Court decision rendered after the state courts have last considered his case, the state courts should have an opportunity to apply the law as changed before the petitioner's remedies are considered exhausted. Ney v. Oberhauser, 419 F.2d 828 (9th Cir. 1969); Subilosky v. Massachusetts, 412 F.2d 691 (1st Cir. 1969); Boyer v. City of Orlando, 402 F.2d 966 (5th Cir. 1968); Pate v. Holman, 343 F.2d 546 (5th Cir. 1965); United States ex rel. Walker v. Fogliani, 343 F.2d 43 (9th Cir. 1965); Miller v. Gladden, 341 F.2d 972 (9th Cir. 1965); Blair v. California, 340 F.2d 741 (9th Cir. 1965); Pennsylvania ex rel. Raymond v. Rundle, 339 F.2d 598 (3rd Cir. 1964); Hunt v. Warden, Md.Pen., 335 F.2d 936 (4th Cir. 1964); Donnell v. Nash, 323 F.2d 850 (8th Cir. 1963), cert. denied, 376 U.S. 924, 84 S.Ct. 686, 11 L.Ed.2d 619 (1964); Mahurin v. Nash, 321 F.2d 662 (8th Cir. 1963), cert. denied, Mahurin v. Carter, 379 U.S. 979, 85 S.Ct. 682, 13 L.Ed.2d 569 (1965); Comment, Habeas Corpus-- Effect of Supreme Court Change in Law on Exhaustion of State Remedies Requisite to Federal Habeas Corpus, 113 U.Pa.L.Rev. 1303 (1965); cf. In Re Whittington, 391 U.S. 341, 88 S.Ct. 1507, 20 L.Ed.2d 625 (1968).
 
 III.
 
 54
 Tibbs' case is procedurally different, but the same principles apply. We think he also must resort to the state courts before seeking federal relief. At the time he filed his federal petition Tibbs had no state remedy, since Virginia did not at that time allow a prisoner to challenge his confinement under a sentence to be served in the future. Under 1950 Code of Va. Section 8-596, as amended, (Supp.1968), however, he may now challenge his ten-year sentence.[2]
 
 
 55
 Normally, of course, a prisoner must exhaust only those state remedies available to him at the time he files his petition in federal court. Cf., e.g., Roberts v. LaVallee, 389 U.S. 40, 88 S.Ct. 194, 19 L.Ed.2d 41 (1967); Fay v. Noia, 372 U.S. 391, 399, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963). However, federal courts commonly require that habeas corpus petitioners resort to newly introduced state post conviction remedies enacted in response to developing federal law, even though the state courts have not yet indicated how broadly they will construe the federal law. See, e.g., Peters v. Rutledge, 397 F.2d 731 (5th Cir. 1968); Pate v. Holman, 343 F.2d 546 (5th Cir. 1965); United States ex rel. Bagley v. LaVallee, 332 F.2d 890 (2nd Cir. 1964) (Federal petition filed prior to effective date of New York law providing new remedy); Midgett v. Warden, Md. State Pen., 329 F.2d 185 (4th Cir. 1964) (Recent Maryland court decisions indicated state would, contrary to holdings before Fay v. Noia, provide effective post conviction procedure); cf. Cheek v. Swenson, 387 F.2d 339 (8th Cir. 1967); Ferrario v. Nebraska, 352 F.2d 620 (8th Cir. 1965). Since Virginia law now provides an effective means by which Tibbs may challenge his ten-year sentence, we believe it is appropriate that he also present his case to the state courts before seeking relief in federal court.
 
 IV.
 
 56
 We have examined the other claims urged by the petitioners James, Hancock, and Callahan and find them to be without merit. We have not considered Tibbs' other claims because he has never presented them to the state courts.
 
 
 57
 We reverse and remand the cases to the respective district courts and direct each court to enter an order affording appellants a reasonable opportunity, not exceeding 90 days, to apply to the respective state courts for examination of whether petitioners were unconstitutionally coerced into abandoning their state appeals. If appellants make no application to the state courts within the prescribed 90 days, the district courts may dismiss their petitions.
 
 
 58
 Affirmed in part, reversed and remanded in part.
 
 
 
 [1]
 Callahan, as one of his grounds for relief, has asserted ineffective assistance of counsel. He maintains that counsel knew he desired to appeal and that he had meritorious grounds for an appeal, but took no steps to perfect an appeal
 1A Because the Supreme Court's decisions in Brady v. United States, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747, Parker v. North Carolina, 397 U.S. 790, 90 S.Ct. 1458, 25 L.Ed.2d 785, and McMann v. Richardson, 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (decided May 4, 1970) were handed down subsequent to the argument in these cases, none of the parties has had an opportunity to consider whether those decisions would be apposite to to such a re-examination. Our disposition of these cases makes it unnecessary for us to consider the question.
 
 
 [2]
 The amendment to Section 8-596 became effective on June 28, 1968, one day after the clerk of this court had received the record on appeal from the denial of Tibbs' second federal petition